(Reap. Dec. 11132)

JOSEPH MARKOVITS, INC. *v.* UNITED STATES

Entry No. 1070760.

(Decided February 9, 1966)

*Barnes, Richardson & Colburn* (*Norman C. Schwartz* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

WILSON, Judge: This is an appeal for reappraisement of the value of certain plastic artificial flowers, exported from Hong Kong on May 16, 1962.

The merchandise was appraised on the basis of export value pursuant to the provisions of section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, at the

invoiced unit "ex-factory" prices, plus charges of $40.69 for "Coolie hire, trucking, lighterage and incidental charges." The issue herein is limited to the correctness of said addition for the charges in question.

Plaintiff concedes that the proper basis for appraisement is export value, *supra*, but contends, as indicated, that said export value is the "invoice ex-factory unit values."

The provisions of the statute under consideration are as follows:

Section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (T.D. 54165):

EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

The record consists of certain documentary evidence and the testimony of one witness called by the plaintiff herein. Plaintiff's exhibit 1 is an affidavit by Li Ka-Shing, sole proprietor of Cheung Kong Plastics Co., manufacturer of the involved merchandise. The affiant therein recites in part:

2. * * * I am in complete charge and supervision of every aspect of my firm's business, including sales of plastic artificial flowers for exportation to the United States to Joseph Markovits, Inc. and others.

3. Prior to November, 1961, the merchandise which Joseph Markovits, Inc. purchased through their agent, Union Mercantile Co. (H.K.) Ltd. was available only on an F.O.B. vessel basis. That is to say, my prices in all instances included charges for trucking, coolie hire, lighterage and incidentals to vessel, and no sales or offers were made at ex-factory prices for delivery at the factory to the purchaser or the purchaser's agent.

4. That on or about November 1, 1961, I agreed verbally with Joseph Markovits, Inc. that should Joseph Markovits, Inc. so. desire, I would sell merchandise produced by Cheung Kong Plastics Co. for delivery at the factory to Joseph Markovits, Inc. or their agent, at an ex-factory price exclusive of any charges for trucking, lighterage, coolie hire and incidentals; and that should Joseph Markovits, Inc. purchase on such ex-factory basis, they or their agent would have complete responsibility for transportation of the merchandise to on board vessel and payment of the said charges.

5. That on or about July 5, 1962, my prior verbal agreement with Joseph Markovits, Inc. pertaining to such optional method of purchasing ex-factory was reduced to writing. A true copy of said agreement is attached hereto as Exhibit A and initialed by me.

6. That notwithstanding the existence of such agreement, all actual sales made by me to Joseph Markovits, Inc. have been on an F.O.B. vessel basis, for the convenience of the parties concerned.

7. That the said agreement, marked Exhibit A and hereto attached, has remained in force without modification of any nature until this day.

\* \* \* \* \* \* \*

Plaintiff's exhibit 2 is an affidavit of Tsang Yuen Kei, Hong Kong, to which is attached statements with reference to sales made by two manufacturers of certain artificial flowers made during the period June 1961 to October 1961. It appears that this affidavit was offered in evidence by the plaintiff for the purpose of showing that "in the ordinary course of trade it is possible to purchase at an ex-factory price" (R. 6). In said affidavit Mr. Kei states as follows:

1. I am the Officer in charge of the Export Department of Far East Rubber and Industries Limited for over five years.

2. That the "1007 Rose Project" which my Company purchased for the Imperial International Corporation at New York, United States of America had always in the past and continue at present to do business with various factories on ex-factory basis.

3. That prices are ex-factory basis which do not include any amounts for items associated with the transportation of merchandise from factory to the vessel, such lighterage, trucking, coolie hire or similar charges. It is our responsibility to pick up the merchandise from the facotires [sic] and arrange for transportation to the vessel at the Company's own account and at its own risk.

4. Annexed hereto and marked "A" and "B" are copies of documents of Hip Sang Metal and Plastic Works and Yee Tak Plastic Flower Factory respectively showing the methods of operating business with them of the said Project.

\* \* \* \* \* \* \*

Exhibit A of plaintiff's exhibit 2 contains a statement by Hip Sang Metal and Plastic Works to the effect that certain artificial flowers shipped by that company to the United States during the months of June 1961 to October 1961 are all on an ex-factory basis including packing. Exhibit B of plaintiff's exhibit 2 contains a similar statement by Yee Tak Plastic Flower Factory, Hong Kong, that the prices of certain "Plastic Rose" shipped by it to the United States during the months of June to August 1961 "are ex-factory prices."

Nicholas V. Marsh, president of Joseph Markovits, Inc., the plaintiff-importer herein, testified as follows: That he is in charge of the importer's purchases of plastic artificial flowers from Hong Kong and that in connection with which he visits Hong Kong from time to time and negotiates prices, delivery, schedules, etc., with about eight different manufacturers, and that he was familiar with the shipment here in question, having personally visited the manufacturer's office in

April of 1962 (R. 17). Mr. Marsh further testified that Cheung Kong Plastics Co. quotes prices in Hong Kong dollars on an ex-factory basis (R. 18); that negotiations with other Hong Kong manufacturers of artificial flowers are in terms of ex-factory prices (R. 19). The witness stated that Cheung Kong Plastics Co. is one of the largest Hong Kong manufacturers of plastic artificial flowers and that his firm imported from said manufacturer approximately $2,500,000 worth of merchandise during 1962 (R. 20). The witness further stated that, based upon his knowledge of the trade, the selling methods of Cheung Kong Plastics Co., as heretofore indicated, are the usual ones and that the other manufacturers with whom he had dealt offered their flowers for sale under the same terms and conditions (R. 20, 21).

On cross-examination, Mr. Marsh testified that there are somewhere between 200 to 400 "places" making flowers in Hong Kong, the bulk of them, however, being very small ones consisting of family operations, working in one room (R. 22, 23). With respect to his negotiations with the manufacturer in this case and the purchases made from said manufacturer by his company, Mr. Marsh testified as follows: That Mr. Picciotto, who is his buying agent, always accompanies him when he is negotiating with Cheung Kong and that the latter company is always represented by its owner, Mr. Li Ka-Shing; that Mr. Picciotto, who represents the Union Mercantile Co., Ltd., Hong Kong, handles all the details of his transactions with Cheung Kong Plastics (R. 23, 24); that, when he pays for the merchandise purchased on his behalf by Union Mercantile from Cheung Kong, he forwards to Union Mercantile "the price indicated on the invoice before the court, together with the items referred to as coolie hire, trucking, lighterage, and incidental charges," and that Union Mercantile on his behalf forwards the total sum to Cheung Kong. It appears from the record that, in this particular shipment, the remittance to the manufacturer was equal to the ex-factory price, plus the amounts invoiced as coolie hire, trucking, lighterage, and incidental charges, amounting to $40.69 (R. 27, 28). Mr. Marsh further testified on cross-examination that the manufacturer does not have any pricelist and that all prices are arrived at by bargaining (R. 29); that, in the bargaining between the manufacturer and the importer, the first price arrived at is an ex-factory price, which "does not include any transportation charges whatsoever" (R. 29, 31); and that he arrives at the transportation charges by a "quick formula" which "comes out to around 2 per cent" which sum is added to the ex-factory price, and that the total sum represents to him his "cost" price (R. 31). Mr. Marsh further stated that Mr. Li, the manufacturer herein, arranges, on his behalf, the transportation of the merchandise from Cheung Kong's plant to on vessel; that Cheung Kong manufactures the merchandise, arranges for the coolie hire, transportation, lighterage, and the so-called inci-

dentals, lays out the money for these charges, and then bills the importer separately for them in addition to the ex-factory price (R. 32, 33). The witness stated that he insures his importations but did not know whether the policy covers him from the time it is on vessel, or from the time it leaves the plant of the manufacturer (R. 33, 34).

On redirect examination, Mr. Marsh stated that the Hong Kong market in artificial flowers is intensively competitive, and that, on the basis of his experience, as one of the largest purchasers of Hong Kong flowers for exportation to the United States, the manufacturers with whom he dealt will sell on any basis desired, ex-factory or otherwise (R. 34, 35).

The defendant introduced in evidence a report (defendant's exhibit A) of Mr. Smith B. Griffin, senior customs representative, Tokyo, Japan, dated May 25, 1960, setting forth certain facts ascertained from an interview with Mr. Raymond J. Picciotto, managing director of Union Mercantile Co., Ltd., the shipper herein, and Mr. Lee Ka-Shing, manufacturer of the involved merchandise. The said report (p. 2) recites substantially as follows: That Union Mercantile Co. "serves solely as buying agent for Joseph Markovits, Inc.," pursuant to a written agreement dated January 26, 1960, which provides for the buying agent to receive for its services "a commission of 5 per cent of the FOB value of each invoice." It further appears from said report (pp. 2–5) that "up to the present time" the entire output of Cheung Kong Plastics Co. "has been sold to Joseph Markovits Inc."; that the manufacturer "never publishes price lists for his merchandise," and that prices are arrived at through "a certain amount of bargaining and negotiation"; that "both Mr. Picciotto and Mr. Lee definitely stated that all quotations and all prices agreed upon are strictly FOB prices, with the manufacturer assuming all costs of delivery to on board the exporting vessel"; that the costs of delivery of the merchandise to on board the exporting vessels were "invariably paid by the manufacturer and were included in the prices quoted in the first place"; that, according to both Mr. Picciotto and Mr. Lee, the manufacturer has "never offered or sold any merchandise for exportation to the United States other than on an FOB basis."

Defendant's collective exhibit B is a report by Senior Customs Representative Stewart H. Adams at Hong Kong, dated October 22, 1963, setting forth certain facts obtained from an interview with Mr. Li Ka-Shing and with Mr. Raymond J. Picciotto, heretofore identified. The report states that the information obtained was secured and verified from the business records of their respective companies. The report in question (p. 1) indicates the following: That Union Mercantile, Ltd., acts as buying agent for Joseph Markovits, Inc., at a 5 percent commission, on all merchandise purchased from Cheung Kong

Plastics Co.; that payments for merchandise purchased by Markovits are always made "by irrevocable letters of credit to the buying agents in the full amount of the invoice and by checks, in the full amount of the invoice, by the buying agent to the manufacturer" (p. 2); that no pricelists are issued or furnished and all prices are arrived at by bargaining (p. 2). It further appears from said report that "The manufacturer sells at F.O.B. prices. The orders are placed at F.O.B. prices" and the manufacturer "contracts for all cartage, lighterage, and coolie hire, and these costs are included in the F.O.B. price"; that originally the manufacturer "invoiced at F.O.B. prices, then about 2 November 1961 the buyers asked him to invoice at ex-factory showing the F.O.B. charges separately." The report further states that "Records of payment received by the manufacturer and record of payment made by the buying agent were reviewed" and that "both reflect merchandise is sold at FOB prices." (P. 3.)

Defendant's exhibit C is the purchase order from Union Mercantile Co., the importer's buying agent, to Cheung Kong Plastics Co., the manufacturer, covering the merchandise here involved, together with the manufacturer's invoice covering said purchase at "F.O.B. Hong Kong" prices. The said order contains the statement that "The above prices are including coolie hire, trucking, lighterage and incidental charges."

The basic issue in this case is whether or not the involved merchandise was freely offered or sold at an ex-factory price. If it was, then the appraiser's action in adding the invoiced inland freight charges to the invoiced unit prices was improper, it being well understood that charges accruing subsequent to the time merchandise leaves the principal market are not ordinarly a part of the value of such goods in such market, but become so only if the merchandise is not freely sold or offered for sale at prices which do not embrace them. *Albert Mottola, etc.* v. *United States*, 46 CCPA 17, C.A.D. 689; *United States* v. *Paul A. Straub & Co.*, 41 CCPA 209, C.A.D. 553; *United States* v. *Gitkin Co.*, 46 Cust. Ct. 788, A.R.D. 132.

The determination of whether imported merchandise is freely sold on an f.o.b. or ex-factory basis depends upon the circumstances existing in the market from which the goods are exported. This is the burden imposed upon the party which challenges the presumptively correct value found by the appraiser, in which connection it is incumbent upon that party to meet every material issue in the case. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495. Here, the appraiser has found that the merchandise in question was not freely offered or sold to all purchasers at the invoiced "ex-factory" prices, and such finding is presumptively correct.

In the case at bar, the mere statement in the affidavit of Mr. Tsang Yuen Kei, in plaintiff's exhibit 2, to the effect that purchases made by

his company in Hong Kong for the account of the Imperial International Corp., New York, had always been and continue to be on an "ex-factory" basis is insufficient, in my opinion, to support a finding that the charges here in question are not part of the value of the involved goods. The affiant's statements in the above regard are not supported by competent evidence of sales or offers of sales being made on an ex-factory basis to Mr. Kei's company, nor is there any competent evidence to establish that offers of sale or sales of merchandise such as is here involved were ever made on an ex-factory basis by other manufacturers or sellers of merchandise. As a matter of note, the alleged shipments referred to in plaintiff's exhibit 2 purportedly took place during the months of June to October 1961, a period of time too remote from the date of exportation of the involved merchandise on May 16, 1962, to have any legal materiality in our present determination. The record in this case clearly establishes that the manufacturer has never offered or sold this merchandise for exportation to the United States at other than on an f.o.b. basis. The situation in the case at bar parallels, in my opinion, that which obtained in the case of *Louis Goldey Co., Inc.* v. *United States*, 52 Cust. Ct. 521, Reap. Dec. 10725 (affirmed in *Same* v. *Same*, 55 Cust. Ct. 759, A.R.D. 196). The court therein in its decision, page 525, stated:

The purported option given to the plaintiff by the manufacturer to purchase merchandise at an ex-factory price without, as in this case, any evidence of actual sales at that price, is insufficient in law, in my opinion, to establish an ex-factory price as the price at which such or similar merchandise was freely offered for sale to all purchasers in the ordinary course of business. * * *

* * * a finding of correct value cannot be predicated upon the existence of a hypothetical market. * * *

In the case of *United States* v. *Aceto Chemical Co., Inc., et al.*, 51 Cust. Ct. 507, A.R.D. 159 (affirmed in *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, C.A.D. 846), the court, page 513, stated:

* * * If there is no other price than the one which includes the freight charge, then, under settled law, the freight charge is inextricably bound up, as an integral part of the purchase price, and may not be allowed. The fact that, under circumstances not shown ever to have existed, a seller might be willing to deduct the cost of freight, if a customer desired to supply his own cartage, does not establish that, in the ordinary course of trade, such merchandise was sold or offered for sale at prices, less freight charge, "Evidence of a hypothetical market, or what a seller would do if confronted by conditions that do not exist, surely should not control over evidence of actual market conditions." *United States* v. *Traders Paper Co. et al.*, *supra.*

Plaintiff, in its brief, contends that the testimony of Mr. Marsh, president of the plaintiff-importer herein with respect to the fact that the importer's total remission to the manufacturer included an amount

representing charges from the factory to the vessel, indicates nothing more than an arrangement solely for the convenience of the parties concerned. It, accordingly, contends that the existence of this so-called convenience option indicates "that the involved merchandise was freely offered, bought and sold in terms of unit ex-factory prices" (plaintiff's brief p. 7). However, in a similar situation, this court, in the case of *Delmonico International Corp.* v. *United States*, 51 Cust. Ct. 416, Reap. Dec. 10598, at page 418, stated:

Plaintiff contends that the evidence establishes that the merchandise was sold at f.o.b. prices only for convenience and that the exporter would have sold ex-factory, if requested. Unsubstantiated statements of this nature have little or no evidentiary value. In *Transatlantic Shipping Co., Inc., et al.* v. *United States*, 28 CCPA 19, C.A.D. 118, the court made the following remarks:

* * * The statement made in the affidavit dated November 23, 1937, that the manufacturer is willing to sell to anyone at the same price charged to the Absorbo Beer Pad Co., Inc., is no proof of market value or price at the time of exportation of the merchandise, as required by the statute.

In the case at bar, the testimony of plaintiff's witness with respect to the so-called option to buy at ex-factory prices is unsubstantiated and, standing uncorroborated, has no evidentiary value. Accordingly, such testimony, standing alone, is insufficient to establish either sales or offers in this case at an ex-factory price. It further appears, from statements in the special customs invoice herein together with the papers annexed thereto which are contained in the official court file, that (1) inland freight is included in the invoice price, and (2) no sales have been made at an ex-factory price. The circumstances surrounding the shipment in question are further outlined in the Government reports, establishing without contradiction, in my opinion, that the manufacturer herein "contracts for all cartage, lighterage, and coolie hire, and these costs are included in the F.O.B. price" (defendant's collective exhibit B, p. 2). Also substantiating the defendant's position in this case is the testimony of the plaintiff's witness that, pursuant to the agreement entered into with the buying agent, the importer herein paid its buying agent "5 per cent of the f.o.b. price of all merchandise" purchased from Cheung Kong (R. 25, 26).

Plaintiff, in its brief, directs our attention to the holding of the court in the case of *United States* v. *Lyons*, 13 Ct. Cust. Appls. 639, T.D. 41484. In that case, the court held that a certain charge for freight was no part of export or foreign value. The court therein, at page 640, stated:

The positive and uncontradicted testimony of Lyons was that he purchased the goods at $1.65, American money, f.o.b. Hamburg, and that that price included not only freight and commissions, but all other charges as well; that the freight on the goods was paid by the factory,

but charged to the importer; that the goods could be bought for delivery at the factory * * *.

As appears from the above, the freight on the goods was paid by the factory, but charged to the importer, and such goods could be bought for delivery at the factory. The court, in the *Lyons* case, *supra*, further found that, in the latter event, any factory would deduct from the purchase price of the merchandise railroad or other extra charges. In my opinion, the court in that case must have found that the merchandise there involved was purchased, in fact, for delivery at the factory and that the charges accruing thereafter were not a part of the purchase price. In the case at bar, the plaintiff has not, in my opinion, established by competent proof that such was the case. On the contrary, the Government reports, not contradicted by any convincing evidence on the part of the plaintiff, and the official papers herein show that "manufacturer sells at F.O.B. prices," and that the "orders are placed at F.O.B. prices" (defendant's collective exhibit B), and that the commission of 5 percent paid to the buying agent was on the basis of the f.o.b. value of each invoice (defendant's exhibit A). In the *Lyons* case, *supra*, the appraiser allowed a deduction for freight, whereas, in the case at bar, an allowance for charges was not made, thus putting the burden upon the plaintiff of establishing that the charges in this case were not part of the value of the goods, a burden which in the opinion of the court has not been met.

Plaintiff also cites as authority for its position the holding of the court in the case of *Kurt Orban Company, Inc.* v. *United States*, 52 CCPA 20, C.A.D. 851, wherein, in reversing the holding of the court in *United States* v. *Kurt Orban Company, Incorporated*, 51 Cust. Ct. 537, A.R.D. 163, our appellate court held in effect that certain inland freight and f.o.b. charges were not part of the value of the merchandise there involved. The court, in A.R.D. 163, had reversed the finding of the trial court in *Kurt Orban Company, Incorporated* v. *United States*, 49 Cust. Ct. 392, Reap. Dec. 10338, wherein the latter court had held that the charges in question were no part of the value of the involved merchandise.

In the opinion of the court, the decision in the *Kurt Orban* case (C.A.D. 851) is not controlling in the present case. The facts of record in the above case and those in the case at bar materially differ in essential details, and the issues involved in the *Kurt Orban* case, *supra*, also differ in certain respects from that which is here before me for determination. In that case, one of the critical factors therein had to do with the application of the terms of the statute relating to price "in the principal markets of the country of exportation" (section 402(b) of the Tariff Act of 1930, as amended). It appears in the *Kurt Orban* case, *supra*, that the merchandise there involved was purchased through an exclusive export sales agency known as "SAPET," located

in Paris. The factories from which the shipments involved were made were located in certain provinces in France. The appellate court (C.A.D. 851) agreed with the holding of the trial judge (Reap. Dec. 10338) that the factories of the sellers were the "principal markets" under the statute and that, as heretofore noted, the statutory "price" was the ex-factory price. It further appeared that all prices quoted and sales made were at an ex-factory price for the merchandise; that when a mill made a sale through its sales agent SAPET for export, the mill made out an invoice to the American purchaser showing an ex-factory unit price as well as a total price for the shipment, the agency in turn showing the same prices on its invoice to the purchaser. A factor in the *Kurt Orban* case, *supra*, not present in the case at bar, was that in no case did the manufacturer of the merchandise therein receive any part of the charges made for transportation and loading, and that the purchaser's obligation to the manufacturer was, in all cases, fully satisfied by remittance of the "ex-factory" price shown on the invoices; further, the ex-factory price shown on the invoice was the amount turned over to the manufacturer by the sales agency, SAPET, after payment by the purchaser. In the case at bar, however, the probative facts of record, as heretofore indicated, differ from those appearing in the *Kurt Orban* case, *supra*. On the facts here presented, the involved charges are properly a part of the value of the merchandise.

The court, accordingly, finds as facts:

1. That the involved merchandise consists of certain artificial plastic flowers, exported from Hong Kong on May 16, 1962.

2. That the merchandise in question was appraised on the basis of export value pursuant to section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165.

3. That the evidence in this case fails to establish that such or similar merchandise was freely offered for sale, in the ordinary course of trade, at an ex-factory price.

4. That there is no competent evidence to establish that the merchandise in question was freely sold, at the factory, at an ex-factory price.

5. That the probative evidence in this case establishes that the merchandise under consideration was freely sold f.o.b. Hong Kong, at a price which included "coolie hire, trucking, lighterage and incidental charges."

As conclusions of law, the court holds:

1. Export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, is the proper statutory basis for the determination of the value of the merchandise herein and that

2. Such statutory value is as found by the appraiser.

Judgment will issue accordingly.